# United States Court of Appeals for the Federal Circuit

---

**MALVERN PANALYTICAL INC.,**
*Plaintiff-Appellant*

**v.**

**TA INSTRUMENTS-WATERS LLC, WATERS TECHNOLOGIES CORPORATION,**
*Defendants-Appellees*

---

2022-1439

---

Appeal from the United States District Court for the District of Delaware in No. 1:19-cv-02157-RGA, Judge Richard G. Andrews.

---

Decided: November 1, 2023

---

BRIAN ROBERT MATSUI, Morrison & Foerster LLP, Washington, DC, argued for plaintiff-appellant. Also represented by DANIEL P. MUINO, FAHD H. PATEL; MICHAEL ALLEN JACOBS, San Francisco, CA.

MATTHEW WOLF, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for defendants-appellees. Also represented by JEFFREY MILLER, Palo Alto, CA; JONATHAN SWISHER, San Francisco, CA.

---

Before PROST, HUGHES, and CUNNINGHAM, *Circuit Judges.*

PROST, *Circuit Judge.*

Malvern Panalytical Inc. ("Malvern") appeals a claim construction order construing the term "pipette guiding mechanism" in the patents-in-suit as a "mechanism that manually guides the pipette assembly." *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, No. 19-cv-2157, 2021 WL 965684, at *3–6 (D. Del. Mar. 15, 2021) ("*Decision*"). Because the district court erred in construing "pipette guiding mechanism," we vacate the stipulated judgment of non-infringement and remand for further proceedings.

BACKGROUND

I

Malvern sued TA Instruments-Waters LLC and Waters Technologies Corporation (together, "Waters") in the District of Delaware for infringing various claims of, among others, U.S. Patent Nos. 8,827,549 ("the '549 patent") and 8,449,175 ("the '175 patent").[1] These patents both disclose microcalorimeters, which are machines that measure the amount of energy absorbed or released during a chemical reaction between two compounds. '549 patent col. 1 ll. 26–29. The specific type of microcalorimeter described in these patents is an isothermal titration calorimeter ("ITC"). *Id.* at col. 1 ll. 37–41.

---

[1]    The '549 patent is a continuation of the '175 patent, and they share a substantially similar specification. For brevity, this opinion cites only the '549 patent specification.

The ITC in the '549 and '175 patents contains several components. One component is the automatic pipette assembly. "The automatic pipette assembly [220] comprises a pipette housing 340, a syringe 350 with a titration needle 360 arranged to be inserted into the sample cell 250 for supplying titrant, and a linear activator 370 for driving a plunger 380 in the syringe 350." *Id.* at col. 4 ll. 60–64.[2] Figure 2 illustrates the pipette assembly components in the context of the microcalorimeter:



Fig. 2

*Id.* at Fig. 2.

---

2    While the specification discloses an "automatic pipette assembly 210" here, we assume it meant to disclose an "automatic pipette assembly 220," as it did earlier. '549 patent col. 3 l. 67–col. 4 l. 1.

Another component, the pipette guiding mechanism, "guide[s] the pipette assembly 220 between and into at least two positions of operation." *Id.* at col. 7 ll. 10–11. The '549 and '175 patents disclose two embodiments of the pipette guiding mechanism. The first embodiment is "a pipette arm 520 that supports the pipette assembly 220, and an essentially vertical guide rod 530." *Id.* at col. 7. ll. 18–20. "The pipette arm 520 is moveably attached by a sleeve 540 to the guide rod 530, but its motion about the guide rod is restricted by a guide grove 550 in the guide rod 530 and a guide pin 560 that protrudes from the inner surface of the sleeve 540 and which fits into the guide groove 550." *Id.* at col. 7 ll. 20–25. With this embodiment, the "movement of the pipette assembly 220 in the vertical direction is restricted to the angular positions of the positions of operation," *id.* at col. 7 ll. 28–30, and "rotational movement of the pipette assembly 220 between the angular positions only is permitted when the titration needle 260 is fully retracted from respective positions of operation," *id.* at col. 7 ll. 31–34. Figure 5a illustrates the guide rod embodiment of the guiding mechanism:



Fig. 5a

*Id.* at Figure 5a.

A second embodiment of the pipette guiding mechanism, "wherein the guide groove in the guide rod 530 is replaced by a coaxial external guide sleeve 610 with corresponding guide paths 620 for the guide arm 520," *id.* at col. 7 l. 66–col. 8 l. 2, is depicted in Figure 6:



*Id.* at Fig. 6.

Claim 1 of the '549 patent and claim 9 of the '175 patent are independent and contain the disputed term, "pipette guiding mechanism."

Claim 1 of the '549 patent states:

1.  A micro titration calorimetry system comprising:

an automatic pipette assembly comprising a titration needle arranged to be inserted into a sample cell for supplying titrant, a syringe for supplying titrant to the titration needle, a stirring paddle for stirring fluid in the sample cell, and a stirring motor for rotating the stirring paddle, and

6    MALVERN PANALYTICAL INC. v. TA INSTRUMENTS-WATERS LLC

> a *pipette guiding mechanism* arranged to restrict the movement of the pipette assembly along safe paths to ensure that the titration needle cannot be damaged during movement thereof between different positions of operation.

'549 patent claim 1 (emphasis added).

> Claim 9 of the '175 patent states:

> 9.   A micro titration calorimetry system comprising:

> an automatic pipette assembly comprising a titration needle arranged to be inserted into a sample cell for supplying titrant, a syringe for supplying titrant to the titration needle, a stirring paddle for stirring fluid in the sample cell, and a stirring motor for rotating the stirring paddle, and

> a *pipette guiding mechanism* arranged to guide the pipette assembly between and into at least two positions of operation, wherein a first position of operation is a pipette washing position wherein the titration needle is inserted in a washing apparatus, and a second position of operation is a titration position wherein the titration needle is inserted into the sample cell for calorimetric measurements.

'175 patent claim 9 (emphasis added).

## II

Relevant to this appeal is another patent, U.S. Patent No. 9,103,782 ("the '782 patent"). Although the '782 patent is unrelated to the '549 and '175 patents, all three patents had a common assignee and are now owned by Malvern. During prosecution of the '782 patent, the examiner rejected various claims as anticipated by U.S. Patent Application Publication No. 2010/0238968 ("the '968

application").[3]  J.A. 2926.  The '782 patent describes the '968 application as disclosing a prior art "manual ITC system," '782 patent col. 2 l. 62, in apparent contrast to the pipette translation unit that is a component of the '782 patent's automated ITC, *id.* at col. 6 ll. 24–32.  Despite this characterization, the examiner rejected the '782 patent as anticipated by the '968 application because the examiner understood the '968 application to disclose an automated ITC system.  J.A. 2926–27.  The '782 patent applicant tried to overcome this rejection by arguing that the '968 application contains a purely manual guiding system.  J.A. 2919.  The examiner again disagreed and rejected the '782 patent as anticipated by the '968 application.  J.A. 2893, 2907.  The '782 patent applicant again argued that the pipette guiding mechanism in the '968 application is "purely a passive guiding mechanism arranged to prevent damage of the sensitive titration needle."  J.A. 2885.  The examiner once again disagreed and observed that the '968 application teaches that "the movements of the pipette are performed using a program (such as that provided by the ITC control system)."  J.A. 2872.  In this same rejection, the examiner noted that because the '968 application and the '782 patent had a common assignee, the '968 application might not qualify as prior art under pre-America Invents Act 35 U.S.C. § 103(c)(1).  J.A. 2858.  The '782 patent applicant, seemingly taking the hint, then argued that the anticipation rejections over the '968 application should be withdrawn because the '968 application did not count as prior art under § 103(c)(1).  J.A. 2852.  The examiner withdrew the anticipation rejection on this basis.  J.A. 2842.

## III

After a change in ownership by which Malvern came to own the '549 and '175 patents, Malvern sought supplemental examination of the '175 patent under 35 U.S.C.

---

[3]    The '968 application resulted in the '175 patent.

§ 257.  J.A. 1418.  As part of an information disclosure statement ("IDS"), Malvern cited 154 documents.  Seven of these were the office action documents from the '782 patent prosecution.  J.A. 1488.  Malvern did not describe or characterize the '782 patent office actions in any way, and nothing in the supplemental examination shows any further discussion of the '782 patent office actions.

During the supplemental examination, the examiner rejected claim 9 of the '175 patent as anticipated by a Microcal iTC200 Microcalorimeter User's Manual.  J.A. 1464–66.  The iTC200 manual contains several descriptions of its guiding mechanism as manually operated.  J.A. 1169, 1174, 1176–77.  Malvern sought to overcome this rejection by arguing that the iTC200 was the applicant's own work.  To do so, Malvern submitted declarations of co-inventor Rochalski.  J.A. 1546.  The first Rochalski declaration stated that the iTC200 manual "simply describes the product Valerian Plotnikov and I invented."  J.A. 1553.  The second Rochalski declaration stated that "Valerian Plotnikov and I invented the features described and claimed in the '549 and '175 Patents" and that "[t]hese relevant features were included in the iTC200 Microcalorimeter."  J.A. 1686.  The examiner thereafter withdrew the rejection of claim 9 over the iTC200 manual.  J.A. 1707.

IV

During claim-construction proceedings before the district court in this case, Malvern argued that "pipette guiding mechanism" should mean a "mechanism that guides the pipette assembly," while Waters argued that it should mean a "mechanism that manually guides the pipette assembly."  *Decision*, 2021 WL 965684, at *3–4.  The district court adopted Waters's proposed construction.  *Id.* at *4.  In doing so, the district court first concluded that the term "pipette guiding mechanism" was a coined term because Malvern presented "no evidence . . . that a 'pipette guiding mechanism' was known or readily understandable" to a

person of ordinary skill in the art. *Id.* at *5. The district court thus examined the intrinsic evidence for "objective boundaries to the scope of the term." *Id.* (quoting *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019)).

The district court looked to the '782 patent applicant's statements during prosecution of the '782 patent to ascertain the scope of the "pipette guiding mechanism," concluding that the '782 patent applicant limited the "pipette guiding mechanism" to only manual embodiments. *Id.* The district court attributed the statements of the '782 patent applicant to Malvern because the '782, '549, and '175 patents had a common assignee and because both parties and the district court treated the common assignee as Malvern. *Id.* at *4 n.2. The district court considered statements made during the '782 patent prosecution when interpreting the '549 and '175 patents because it concluded that Malvern agreed the statements cited in the IDS during supplemental examination were incorporated into the intrinsic record. *Id.* In part relying on this prosecution history, the district court limited "pipette guiding mechanism" to manual guiding mechanisms.

Following claim construction, the parties stipulated to non-infringement, J.A. 34–35, and the district court entered a final judgment of non-infringement, J.A. 29. Malvern timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Claim construction is a question of law this court reviews entirely de novo where, as here, the construction relies solely on the intrinsic evidence. *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1345 (Fed. Cir. 2020).

Malvern and Waters dispute whether the term "pipette guiding mechanism" encompasses only manual guiding mechanisms (Waters's position) or covers both manual and

automatic guiding mechanisms (Malvern's position).  We agree with Malvern that "pipette guiding mechanism" means a mechanism that guides the pipette assembly manually or automatically.

We proceed first by analyzing the claim language, specification, and the co-inventor declarations submitted with the '175 patent supplemental examination.  We then analyze the district court's conclusion that "pipette guiding mechanism" is a coined term.  We finally analyze the impact, if any, that the '782 patent prosecution history has on our claim construction.

I

Claim terms are generally construed according to their ordinary meaning to a skilled artisan at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).  This meaning "provides an objective baseline from which to begin claim interpretation." *Id.* at 1313.  To that end, we consult intrinsic evidence, such as "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," and, to the extent it applies, extrinsic evidence.  *Id.* at 1314.  We keep in mind that a skilled artisan "is deemed to read the claim term . . . in the context of the entire patent, including the specification." *Id.* at 1313.  Additionally, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* at 1317.  However, "because the prosecution history represents an ongoing negotiation between the [United States Patent and Trademark Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Starting with the claim language, we conclude that "pipette guiding mechanism" has a plain and ordinary

meaning—a mechanism that guides the pipette assembly. It is appropriate to construe this term by looking to the words "pipette," "guiding," and "mechanism" individually. *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1381 (Fed. Cir. 2022) ("[T]he district court was correct in seeking to give meaning to the term 'fastening stem' by looking to the meaning of the words 'fastening' and 'stem' as used in the patent."); *see also 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013) ("For this claim term the patentee offers an ascertainable definition in the body of the claim, and our cases do not support prescribing a more particularized meaning unless a narrower construction is required by the specification or prosecution history."). Looking at the individual words in the claim, the immediately apparent meaning is that a "pipette guiding mechanism" is a mechanism that guides the pipette. The claim language contains no restrictions that would suggest that the "pipette guiding mechanism" is only manual. Instead, the broad claim language supports the conclusion that the "pipette guiding mechanism" encompasses both manual and automatic embodiments.

The claim term here is similar to the claim term we interpreted in *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014). In *Hill-Rom*, we construed the term "datalink" to mean a link that conveys data. *Id.* at 1375. We did so over the objection of the accused infringer, who argued that we should limit the construction of datalink to the wired embodiments disclosed in the patent. *Id.* at 1373–74. In our view, the broad language of the claim supported a broad construction of the claim term. *See id.* at 1375 ("There is nothing improper about defining 'datalink' as a link that conveys data. If one of skill in the art at the relevant time would understand that datalinks can be both wired and wireless, then the patentee is entitled to the full range of that claim term."). The similar breadth here compels a similarly broad result—that the "pipette

guiding mechanism" is not limited to manual embodiments.

The remaining language in claim 1 of the '549 patent and claim 9 of the '175 patent supports this reading. Claim 1 specifies that the "pipette guiding mechanism" is "arranged to restrict the movement of the pipette assembly along safe paths to ensure that the titration needle cannot be damaged during movement thereof between different positions of operation," and claim 9 specifies that the "pipette guiding mechanism" is "arranged to guide the pipette assembly between and into at least two positions of operation." The claims clarify and restrict what the guiding mechanism does, but they provide no language suggesting the restriction to manual embodiments Waters advocates.

The specification confirms our broader understanding of the "pipette guiding mechanism." It discloses two embodiments of the guiding mechanism. The first embodiment is a guide arm that can move only by way of a guide rod where permitted by guide grooves. '549 patent col. 7 ll. 8–65. The second is a guide arm that can only move where permitted by a coaxial guide sleeve. *Id.* at col. 7 l. 66–col. 8 l. 2. The specification contains no language describing the invention as limited to a manual guiding mechanism, stating that "the present invention 'is,' 'includes,' or 'refers to'" a manual guiding mechanism, or "expressing the advantages, importance, or essentiality" of a manual guiding mechanism. *Hill-Rom*, 755 F.3d at 1372. In fact, the specification states nothing about whether the guiding mechanism is manual or automatic. This absence leads us to conclude that nothing in the specification explicitly or implicitly limits the guiding mechanism to manual embodiments. *See id.* at 1373 ("There are no magic words that must be used, but to deviate from the plain and ordinary meaning of a claim term to one of skill in the art, the patentee must, with some language, indicate a clear intent to do so in the patent. And there is no such language here.").

Waters resists this conclusion by invoking portions of the specification that allegedly indicate that the "pipette guiding mechanism" is manual. Waters cites descriptions of "pre-set factory alignment" of the pipette assembly that "significantly improves usability and reliability of the instrument" and "makes the quality of measurements independent of the user skills." '549 patent col. 8 ll. 21–25. Waters also cites that the guiding mechanism "enables proper positioning of the pipette assembly." *Id.* at col. 8 ll. 25–26. According to Waters, "these references plainly contemplate that a 'user' must manually move the pipette assembly into positions of operation, assisted by the pre-aligned guidance mechanism to avoid variability between experiments." Appellee's Br. 51. Waters's heavy reliance on these disclosures is misplaced, however, because the benefits articulated in these disclosures are consistent with both manual and automatic embodiments of the guiding mechanism. As Malvern persuasively argues, "a guiding mechanism that restricts the movement of the pipette assembly between predetermined positions of operation improves usability and reliability and makes measurement independent of user skills—regardless [of] whether the pipette assembly is manually or automatically moved within those constraints." Reply Br. 25. At bottom, these descriptions say nothing about whether the guiding mechanism is manually or automatically operated.

Waters further invokes the fact that the pipette assembly and stirring motor are automatic. '549 patent col. 5 l. 1–col. 6 l. 2. According to Waters, the implication is that the "pipette guiding mechanism" is not automatic since the specification never explicitly describes the "pipette guiding mechanism" as automatic. Our conclusion from this difference, however, is that unlike the pipette assembly and the stirring motor, the specification describes the guiding mechanism broadly, without limitation to either manual or automatic embodiments. Waters does not point to portions of the specification that change our conclusion—that the

specification neither explicitly nor implicitly limits the "pipette guiding mechanism" to manual embodiments.

Waters also argues that the prosecution history of the '175 patent supplemental examination limits the guiding mechanism to manual embodiments. The co-inventor declarations submitted during the '175 patent supplemental examination do not change our conclusion. During the supplemental examination, the examiner initially rejected claim 9 of the '175 patent as anticipated by the iTC200 manual. J.A. 1464–66. Malvern overcame this anticipation rejection by submitting co-inventor declarations establishing that the iTC200 was the original applicant's own prior art. J.A. 1553, 1686. Waters argues that these statements mean that Malvern argued the '175 patent was co-extensive with the iTC200, which is manually operated. Appellee's Br. 52–54. The context of Malvern's statements during the supplemental examination, however, indicates that the co-inventor declarations do not bear on the precise scope of the '175 patent; they establish only that the iTC200 embodied what was described and claimed in the '549 and '175 patents. *See Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 15 (Fed. Cir. 2020) ("[C]laim construction . . . focuses on the recited limitations of the *claims*, not the features of a commercial embodiment of the invention.").[4]

In sum, the claim language and the specification indicate that the term "pipette guiding mechanism" in the '549 and '175 patents is used broadly. The prosecution history discussed above does not change our conclusion. Thus, the claim language and specification both support the conclusion that "pipette guiding mechanism" is a mechanism that

---

[4]  For this reason, we consider these statements "too vague or ambiguous to qualify as a disavowal of claim scope." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003).

guides the pipette assembly either manually or automatically.

## II

The district court took a different view, concluding that "pipette guiding mechanism" is a coined term with no commonly understood meaning in the art. *Decision*, 2021 WL 965684, at *5. On this basis, the district court concluded that "pipette guiding mechanism" "cannot be construed broader than the disclosure in the specification." *Id.* at *6 (quoting *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357–58 (Fed. Cir. 2016)).

In *Indacon*, we held that claim terms that "have no plain or established meaning to one of ordinary skill in the art" "ordinarily cannot be construed broader than the disclosure in the specification." *Indacon*, 824 F.3d at 1357 (citing *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)). We have sparingly applied this principle of construction in other cases. *See, e.g., Iridescent Networks*, 933 F.3d at 1353 (considering a "coined term of degree"); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007) (citing *Irdeto*, 383 F.3d at 1300).

The district court's analysis predominantly addressed whether "pipette guiding mechanism" has a plain and ordinary meaning broadly in the art. *Decision*, 2021 WL 965684, at *5 (concluding that "pipette guiding mechanism" is a coined term because Malvern did not show "pipette guiding mechanism" was known in the art or readily understandable to a skilled artisan). This analysis, however, does not answer the question of what plain and ordinary meaning a term has in the context of a patent, which is the focus of our analysis. *See 3M Innovative Props.*, 725 F.3d at 1328–30 (evaluating the plain and ordinary meaning of a patent term that "does not have an ordinary meaning outside of the [asserted] Patents"). We discern plain and ordinary meaning by examining the claims

themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314.  As we explained above, the plain and ordinary meaning of "pipette guiding mechanism" is a mechanism that guides a pipette, which can be either manual or automatic.

## III

A remaining question is how much weight we should give the '782 patent prosecution history in our analysis. The district court concluded that the prosecution history of the '782 patent was relevant to the construction of "pipette guiding mechanism." *Decision*, 2021 WL 965684, at \*5. The district court relied heavily on the '782 patent prosecution history to limit the guiding mechanism to manual embodiments. *Id.* at \*5–6.

We conclude that merely listing the '782 patent office actions in the IDS of the '175 patent supplemental examination was insufficient to inform the meaning of "pipette guiding mechanism" in the unrelated '175 and '549 patents.  On this basis alone, we conclude that the district court erred when it used the '782 patent prosecution history statements to limit "pipette guiding mechanism" to manual guiding mechanisms.

"In the absence of an incorporation into the intrinsic evidence, this court's precedent takes a narrow view on when a related patent or its prosecution history is available to construe the claims of a patent at issue and draws a distinct line between patents that have a familial relationship and those that do not." *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004).  However, even once a reference has been incorporated into the intrinsic record, such as by citation in an IDS, *see Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303–04 (Fed. Cir. 1997), the amount of characterization of that reference in the IDS impacts how informative we consider that reference when evaluating a patent.  For example, listing of references in an IDS does no more than admit "that references in the disclosure

may be material to prosecution of the pending claims," but it does not admit materiality. *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1279 (Fed. Cir. 2003). Likewise, a patentee has not necessarily admitted that a listed reference's characterization or use of a claim term bears on the proper construction of that term in the patent. *See id.*

We conclude that Malvern's bare listing of the '782 patent office actions in the IDS during the '175 patent supplemental examination did not amount to an admission that the '782 patent prosecution history is material (or controlling) in construing "pipette guiding mechanism." The sum total of the references to the '782 patent prosecution history is seven lines in the IDS citing office actions from the '782 patent prosecution.[5] Malvern's bare references to the '782 patent office actions in the IDS for the '175 patent supplemental examination are insufficient to impact our understanding of the specification and claim language. On this basis alone, the '782 patent prosecution history statements cannot limit the scope of "pipette guiding mechanism."

## IV

Even if, however, the bare references to the office actions in the IDS were sufficient for us to consider the '782 patent prosecution history in our analysis, the statements in the '782 patent prosecution history do not clearly and

---

[5]    The IDS in the '175 patent supplemental examination cites only the office actions from the '782 patent prosecution, not the '782 patent applicant's arguments. Because we conclude the district court improperly considered the '782 patent prosecution history, we do not address the propriety of the district court's consideration of additional documents not cited in the IDS.

unambiguously disclaim any scope of "pipette guiding mechanism."

Because we concluded above that the ordinary meaning of "pipette guiding mechanism" is a mechanism that guides the pipette assembly either manually or automatically, we consider whether the '782 patent prosecution statements could disclaim the broad scope of "pipette guiding mechanism." The doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g*, 334 F.3d at 1323. Prosecution disclaimer, which can arise from arguments made during prosecution or claim amendments, "only applies to unambiguous disavowals." *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012).

Here, although the '782 patent applicant argued that the '968 application discloses only a manual guiding mechanism, J.A. 2919, the examiner clearly stated its rejection of this argument several times. J.A. 2858, 2872–73, 2893, 2906–07, 2926–27. The '782 patent applicant then abandoned this unviable argument that the '968 application only discloses a manual guiding mechanism and instead successfully argued that the '968 application did not qualify as prior art. J.A. 2842, 2852. A reasonable interpretation of this colloquy with the examiner is that by abandoning its argument that the '968 application discloses only a manual guiding mechanism, the '782 patent applicant acquiesced to the examiner's views regarding the scope of the '968 application.

In these circumstances, where an applicant abandons its unsuccessful argument, we conclude that the prosecution history lacks the clarity necessary to establish prosecution disclaimer. We have previously declined to find prosecution disclaimer where an applicant made an allegedly disclaiming argument to overcome prior art, the examiner disagreed, and the applicant "never repeated the

MALVERN PANALYTICAL INC. v. TA INSTRUMENTS-WATERS LLC   19

allegedly disclaiming statements and instead offered alternative reasons to overcome" the prior art. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009). The circumstances here are similar to the circumstances in *Ecolab*. By abandoning its arguments about the scope of the '968 application, "a reasonable reader" of the '782 patent prosecution history could conclude that the '782 patent applicant "recognized its error and never again repeated or relied upon the erroneous rationale." *Id.* In such circumstances, an applicant's statements "simply are not clear and unmistakable enough to invoke the doctrine of prosecution history disclaimer." *Id.*; *see also Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1120–21 (Fed. Cir. 2016) (concluding no unambiguous prosecution disclaimer where a patent applicant attempted to add a limitation, the examiner rejected the added limitation under § 112 as new matter, and the applicant "never again sought to limit the claims" with the additional limitation).

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For the foregoing reasons, we conclude that the proper construction of "pipette guiding mechanism" is a mechanism that guides the pipette assembly either manually or automatically.[6] We thus vacate the stipulated judgment of non-infringement and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED**

COSTS

Costs to Malvern.

---

[6]    The district court may need to further refine this construction on remand, consistent with our holding here. *In re Papst Licensing Digital Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015).